NEW JERSEY HIGHWAY AUTHORITY, PLAINTIFF-APPELLANT, v. MARY RENNER, DEFENDANT-RESPONDENT.

Argued May 2, 1955—Decided May 31, 1955.

Mr. *Morris M. Schnitzer* argued the cause for the appellant.

Mr. *Wallace P. Berkowitz* argued the cause for the respondent.

The opinion of the court was delivered by

JACOBS, J. ▆ The Chancery Division granted plaintiff's claim for specific performance of the defendant's agreement to convey premises in Woodbridge and denied the defendant's counterclaim for the alleged wrongful act of the plaintiff in delaying or preventing her removal of the building located thereon and then demolishing it. The defendant appealed to the Appellate Division contending that there was error in the dismissal of her counterclaim and that she was entitled to a jury trial on the issue which it raised. This contention was sustained in an opinion by Judge Clapp reported in 32 *N. J. Super.* 197 (*App. Div.* 1954), and the counterclaim was remanded for trial. We granted certification under *R. R.* 1:10–2. See 17 *N. J.* 226 (1955).

Since 1952 the plaintiff has been engaged in building the Garden State Parkway. See *Town of Bloomfield v. New Jersey Highway Authority,* 18 *N. J.* 237 (1955). In 1953 it determined that the defendant's property in Woodbridge would be required for the Parkway and it negotiated with the defendant for its purchase. On March 21, 1953 a contract was entered into between the plaintiff and the defendant which provided that the property would be conveyed for the sum of $17,500; the contract stated that the defendant could remove the building on the property on or before April 1, 1953. The building was never removed by the defendant but was demolished by the plaintiff's contractor on May 27, 1953 and the land was actually occupied by the plaintiff and used for Parkway purposes. On May 19, 1953 the plaintiff instituted an action in the Law Division demanding judgment for possession and specific performance, preliminary injunctive relief, and *mesne* damages. This action was dismissed by a stipulation dated June 4, 1953. The plaintiff contends that the stipulation was signed pursuant to an agreement between counsel that the defendant would perform the contract and the parties would "exchange general releases"; the defendant contends that no one had authority to enter into such agreement on her behalf and general releases were never executed.

On September 24, 1953 the plaintiff instituted its action in the Chancery Division which demanded that the defendant be required to perform specifically her agreement of March 21, 1953 and that she pay damages in the sum of $10,000 plus costs. She filed answer and counterclaim which indicated that she was willing to deliver a deed for the premises provided the plaintiff would reimburse her for "consequential damages to her property"; her claim (apart from matters which have been abandoned) rested generally upon the assertion that the plaintiff had "interfered with and placed obstacles" to the removal of the building to her substantial damage. Her story was substantially as follows: In March 1953' she asked Mr. Adamowicz, a house mover, for an estimate of the cost of removing her building to a new site which had been selected tentatively; he inspected the building and surroundings and told her the removal would cost $6,500. Thereafter she signed the contract of March 21, 1953 with the plaintiff. At about that time the plaintiff dug an enormous moat or ditch in the rear of the building and in the path of the contemplated movement of the building; the porch on the building was "knocked off in order that the line of the moat may be made straight." When Mr. Adamowicz saw the moat he told the defendant that because of it he could not abide by his original estimate of $6,500 and that it would cost an additional $10,000 ($16,500 in all) for the moving of the building. Although the defendant made efforts to obtain other house movers she was unable to make satisfactory arrangements in time and the building (which was of substantial value to her) was partially dismantled and then demolished by the plaintiff without compensation for her damages.

The defendant contends and the Appellate Division found that the Chancery Division's determination that the plaintiff was entitled to specific performance of the March 21 agreement did not dispose of her counterclaim which must await trial by jury. The pretrial order set forth that there were equitable as well as legal issues involved and that "all equitable issues arising out of the complaint, the defense and counter-

claim will be tried by the court; all law issues will be tried by a jury." Both parties agreed "to permit the jury trial to be had in Mercer County where the equity case will be tried." On its own case the plaintiff simply introduced the March 21 agreement and called the defendant as its witness to testify with respect to her refusal or failure to execute a deed to the premises. The defendant then called her witnesses; they were Mr. Sladkus, attorney for the defendant in the negotiations which resulted in the March 21 agreement, the defendant Mary Renner and her daughter Marianne Renner. Their testimony included references to the digging of the moat and its effect on the contemplated moving of the building; Mr. Sladkus also testified that although the agreement provided that the defendant could remove the building on or before April 1 he was told by the plaintiff's representative that the defendant could have "a few weeks after that." At the close of the testimony on the defendant's behalf her counsel remarked, "That is the defendant's case at this time, Judge." Counsel for the plaintiff then inquired whether "that includes the counterclaim as well as the defense" and counsel for the defendant said, "Of course not." The trial judge then said, "The counterclaim is a jury trial" and counsel for the defendant remarked, "That is right. That has all been set forth." Finally, the trial judge remarked, "The theory of the trial of this case was that we first try the equity case. If the plaintiff succeeds on the equity case there would be no necessity for the law case. We take one step at a time."

After the foregoing colloquy, counsel for the plaintiff called an employee of the Lawyers-Clinton Title Insurance Company of New Jersey who testified that she had asked the defendant to sign a deed but that the defendant had refused, and Mr. Gillette, the attorney for the defendant who signed the stipulation dismissing the Law Division action and testified with respect thereto. The defendant's counsel then recalled Mr. Sladkus, the defendant Mary Renner and her daughter Marianne, who testified generally with respect to Mr. Gillette's participation in the Law Division action. No further witnesses were called and although the record is somewhat obscure

there does not appear to have been any real trial of the issue presented in the counterclaim. The plaintiff called no one to testify with respect to the digging of the moat and any effect it may have had on the contemplated removal of the building; it introduced no testimony to controvert the defendant's story as hereinbefore outlined or the inferences to be drawn therefrom; and it produced no evidence to indicate that the moat was not across a proper route of removal contemplated by the parties or that there were other equally suitable routes. None of the persons who authorized the moat and directed its path and construction and none of the house movers testified. When counsel for the plaintiff made his summation, at the close of the testimony introduced by the parties, he simply contended that the plaintiff was entitled to specific performance of the March 21st agreement in accordance with its terms and made no reference whatever to the moat or to the defendant's contention that by digging it the plaintiff had wrongfully delayed or prevented her removal of the building. On the other hand, in his summation, counsel for the defendant said, "I am not going to argue against specific performance. They got the land. They are using it for highway purposes and we agreed to sell them the land. So, we are not going to argue about that." Later he said: "Our argument is advanced on the house; what they did; how they interfered with taking this house off; what other things interfered with the taking of the house off, and the fact that they demolished the house."

In his oral opinion the trial judge found that the defendant had duly executed the March 21 agreement and that the plaintiff was entitled to have it specifically performed. He made no direct findings or references to the digging of the moat and its effect. He did state generally that he could find nothing "inequitable or unconscionable" in the plaintiff's actions and that it had been "exceptionally patient." But that did not constitute an affirmative finding that the plaintiff had not wrongfully delayed or prevented the removal of the building by the digging of the moat; indeed, in view of the meager and confused state of the record such an

affirmative finding would hardly have been warranted. After stating (1) that the plaintiff was entitled to specific performance, (2) that the plaintiff should pay interest, and (3) that there were to be no costs, except a $150 counsel fee assessed earlier in the plaintiff's favor, the trial judge concluded: "That disposes of the law action also." The Appellate Division's reversal of this last determination is the only matter which the parties have presented to us for review. The plaintiff, in advancing the position that the trial judge's determination should be reinstated, has urged several procedural principles which we approve but consider to have no just application to the situation before us.

 Our judicial system contemplates that generally all matters in controversy between the parties, whether legal or equitable, will be disposed of in a single action. See *Massari v. Einsiedler*, 6 *N. J.* 303, 313 (1951); *Garrou v. Teaneck Tryon Co.*, 11 *N. J.* 294, 305 (1953); *Asbestos Fibres, Inc. v. Martin Laboratories, Inc.*, 12 *N. J.* 233, 239 (1953); *Tumarkin v. Friedman*, 17 *N. J. Super.* 20, 24 (*App. Div.* 1951), certification denied 9 *N. J.* 287 (1952). Where, as here, the plaintiff brings an action to enforce a contract the defendant is obliged to set forth all the defensive matter upon which he may at any time seek to rely. *R. R.* 4:12–2; *R. R.* 4:12–8; *Schnitzer and Wildstein, N. J. Rules Service*, A–IV–226. And while we have not adopted *Federal Rule* 13(*a*) relating to compulsory counterclaims seeking affirmative relief (*cf. R. R.* 4:13–1) we have sought to encourage defendants to assert such affirmative claims as they may have in the form of counterclaims rather than independent actions; indeed, the line between the defensive and other matter may be indistinct and the safer course generally will be to set it all forth by way of answer and counterclaim. See *Massari v. Einsiedler, supra*, where the defendant failed to seek reformation in the original action instituted against him but, after an adverse decision, filed an independent reformation proceeding contending that the relief he sought was not defensive but was the proper subject of an independent action; the court rejected the defendant's contention and held that the

judgment in the original action barred his assertion of the claim for reformation.

In the instant matter the defendant claimed that the plaintiff had wrongfully interfered with her right to remove the building and had demolished it, thereby causing damages which she sought to recover. She was entitled to assert such claim even without regard to the plaintiff's right to specific performance; she could presumably have set it forth in an independent action triable by jury; instead she properly sought her relief in the form of a counterclaim. When this was done the trial judge had before him the plaintiff's equitable claim for specific performance and the defendant's legal claim for damages and it was his responsibility to fix the sequence of trial. See *R. R.* 4:40–2 which expressly provides that, "When certain of the issues are to be decided by a jury and others by the court, the court may determine the sequence in which such issues shall be tried." In accordance with the widespread practice in our State, the trial judge determined that the plaintiff's equitable action for specific performance would be tried first; in federal practice the court generally endeavors to seek out the basic issue in the entire litigation and have it control the sequence of trial. See 5 *Moore, Federal Practice,* 148, 179 (1951). The specific performance action was tried first and completed and the parties may not deny that once it was decided the issues actually there presented and finally determined became binding; under acknowledged public policy principles of *res judicata* and collateral estoppel the parties could not relitigate them in the same or separate proceedings involving the same or separate causes of action. See *Restatement, Judgments,* § 1, *p.* 9, § 68, *p.* 293 (1942); *Scott, Collateral Estoppel by Judgment, 56 Harv. L. Rev.* 1 (1942). *Cf. United States v. Munsingwear,* 340 *U. S.* 36, 71 *S. Ct.* 104, 105, 95 *L. Ed.* 36 (1950); *Bango v. Ward,* 12 *N. J.* 415 (1953). In the *Munsingwear* case Justice Douglas recently quoted approvingly from *Southern Pacific R. Co. v. United States,* 168 *U. S.* 1, 48, 18 *S. Ct.* 18, 27, 42 *L. Ed.* 355, 377 (1897) where the court said:

"The general principle announced in numerous cases is that a right, question, or fact distinctly put in issue, and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies; and even if the second suit is for a different cause of action, the right, question or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified."

See *Templeton v. Scudder*, 16 *N. J. Super.* 576, 583 (*App. Div.* 1951); *Stone v. William Steinen Mfg. Co.*, 7 *N. J. Super.* 321, 327 (*Cty. Ct.* 1949), affirmed 6 *N. J. Super.* 178 (*App. Div.* 1950); *Hudson Transit Corp. v. Antonucci*, 137 *N. J. L.* 704, 706 (*E. & A.* 1948); *In re Walsh's Estate*, 80 *N. J. Eq.* 565, 569 (*E. & A.* 1909).

We assume, therefore, that if, in the instant matter, the issue resting on the digging of the moat had actually been presented and finally determined against the defendant in the specific performance action, then the counterclaim would have been barred. However, as we have hereinbefore indicated, that may not fairly be said to have occurred. From the start the parties proceeded on the basis that the issue raised in the counterclaim was not merely incidental to the equitable cause of action (*cf. Steiner v. Stein*, 2 *N. J.* 367 (1949); *O'Neill v. Vreeland*, 6 *N. J.* 158 (1951)), but was an independent cause of action triable by jury. The parties presumably realized that the plaintiff, as a public body with condemnation powers, could not have been prevented from taking the defendant's land and, in fact, it had possession thereof during the entire proceedings. The defendant might well have tendered a deed, reserving her right to litigate the counterclaim; instead, she filed answer which contained matters which have been abandoned but also indicated her willingness to deliver a deed upon reimbursement "for consequential damages to her property" as sought in her counterclaim. Although the granting of specific performance is ordinarily discretionary (*Gulvin v. Sunshine Park, Inc.*, 137 *N. J. Eq.* 249 (*E. & A.* 1945)) there was, in view of the public nature of the plaintiff, hardly any room for the exercise

of discretion in the instant matter. It must have been apparent to all very early in the proceedings that the plaintiff should, in any event, have the land at the agreed price and that the only real issue to be litigated between the parties was whether the defendant should receive damages for the plaintiff's alleged wrong. Although proper and timely presentation of that issue would have avoided the confusion and the needless litigation to date, we do not believe that the defendant should consequently be denied fair determination of the counterclaim which she has persistently advanced and asserted to be triable by jury. We are satisfied that, under the particular circumstances presented, justice will best be served by remanding the cause for jury trial of the counterclaim as decided by the Appellate Division; after all, justice is the polestar and our procedures must ever be moulded and applied with that in mind. *X-L Liquors v. Taylor*, 17 *N. J.* 444, 454 (1955); *Handelman v. Handelman*, 17 *N. J.* 1, 10 (1954).

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, JACOBS and BRENNAN—6.

*For reversal*—Justice BURLING—1.